UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CLIFFORD MCDOWELL, SR.,

Plaintiff,

v.

**REPORT AND RECOMMENDATION**

13-CV-857A

IROQUOIS JOB CORPS CENTER EDUCATION AND TRAINING RESOURCES,

Defendant.

---

## INTRODUCTION

This case has been referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings, including the preparation of a Report and Recommendation on dispositive motions. [9].[1] Plaintiff Clifford McDowell, Sr. commenced this action pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §1981, and §290 of the New York State Human Rights Law. Before me is defendant's motion for Summary Judgment [27]. For the following reasons, I recommend that the motion be granted.

---

[1] Bracketed references are to the CM/ECF docket entries.

**BACKGROUND**

Plaintiff began employment with Iroquois Jobs Corps Center Education and Training Resources ("ETR") as a leisure time advisor in November 1999. Complaint [1], ¶9. ETR operates the Iroquois Job Corps Center (the "Center") which works with disadvantaged youth, ages 16 to 24, to improve their quality of life through vocational and academic training. Statement of Undisputed Material Facts [28], ¶1.

Plaintiff, who is African-American, alleges that he was the recipient of hostile employment actions from his supervisor, Savonte Walker. Complaint [1], ¶11.[2] Plaintiff asserts that Walker, who is also African-American, regularly referred to him as a "peanut head", and "idiot", being "slow", and working "like a Jamaican". Id., ¶17. He also asserts that Walker subjected him to disparate treatment in that he was forced to go through security checks that were not required of other ETR employees. Id., ¶16. Plaintiff states that he complained about Walker's conduct to the human resources department and to Center director Melissa Vople but that his complaints were ignored. Id.,¶20. He claims that his termination was orchestrated by Walker in retaliation of his complaints. Id., ¶¶ 21-22.

Plaintiff's employment history at the Center included several incidents for which he was counseled. On April 22, 2009, plaintiff was counseled by Richard D. Walls and James Mirand[3] regarding inappropriate behavior occurring in the recreation building ([30-2], p. 47 of 74). It appears that students reported other students having sex in the movie room, acting crazy and throwing things, and cursing. Id. The Memo of Conversation stated:

---

2 Eric Vaughn, who held the title of Recreation Supervisor, was plaintiff's direct supervisor. Vaughn reported to Walker, who was the Independent Living Director. Declaration of Plaintiff [36], ¶¶10-13.

3 Walls was in charge of the dormitories and recreation at that time. Affidavit of James J. Rooney [30], Exhibit A, p. 57. Mirand was the Recreation Supervisor and plaintiff's direct supervisor prior to Vaughn. Declaration of Plaintiff [36], ¶11.

> "As we have discussed some of the mentioned concerns in the past among other concerns, it appears that behavior expectations are not consistently enforced in the recreation area; staff need to be visible and mobile addressing behaviors as they see them. Only open areas that staff are able to monitor effectively. If students are having sex in the movie room what kind of supervision is occurring, more than one group of students have reported this. . . . Continued concerns of this nature in the area you supervise are unacceptable."

Id.[4]

On March 12, 2010 plaintiff was counseled for failing to meet Mentee Case Note Requirements relating to weekly interaction with mentees ([30-2], p. 48 of 74). On March 30, 2011, plaintiff was reprimanded for "talking about other staff and spreading malicious rumors about [his] boss", for failing to "use core values in your conversations with other staff members", and for failing to disclose any core value infractions by a supervisor. Id., p. 49 of 74.[5]

A Staff Accountability Report dated May 11, 2011 reflects that plaintiff was reprimanded because there was garbage all over the floor and underneath the furniture in the movie room. He was counseled that the recreation area must be kept to the cleanliness standard of the center and was advised that "any further instances of failure to follow this procedure can or will result in the termination of your employment" ([30-2], p. 50 of 74).

Plaintiff testified that at one point a rumor was being circulated that plaintiff was sleeping with female students and buying food for students ([30-1], p. 81 (39 of 93)). Plaintiff testified that he had conversations with Walker regarding the rumors. Id. He stated that although Walker told him, in essence, "not to worry about it", she did attempt to obtain statements from students

---

4 Plaintiff testified that every recreation advisor received this Memo of Conversation ([30-1], p. 57 (24 of 93)).

5 Plaintiff testified that the "boss" referred to in this Staff Accountability Report was Oscar Pitts ([30-1], p. 68 (33 of 93)). Pitts was the Recreation Supervisor, and plaintiff's direct supervisor before Mirand (Plaintiff's Declaration [36], ¶12) . Plaintiff testified that students reported to Walker that Pitts smelled like marijuana during a skating trip, but that plaintiff, who was on the trip with Pitts and the students, would not verify the students' reports. He stated that Walker always held his failure to report Pitts against him ([30-1], p. 66-70 (31-35 of 93)).

regarding the rumors. Id., pp. 81-82 (39-40 of 93). Plaintiff was not disciplined based upon these rumors. Id.

On July 31, 2012 a student employee leader reported to David Colonna[6] that Tracy Perrin, another student employee, had been smoking marijuana in the Center and had just attempted to sell him marijuana ([30-2], p. 52 of 74). David Colonna's investigation of this claim included a search of Perrin's locker, which revealed "multiple dime bags of marijuana" that Perrin admitted were his. Id. Perrin asked Colonna if he would continue to assist with his education if he provided information "the Center should know". Id. He then advised Colonna that plaintiff and another ETR employee named Haynes provided student employees with alcohol. Perrin stated that plaintiff filled water bottles with vodka and gave them to student employees to sell to other students for him. Id. Perrin stated that a bus trip to Wal-Mart "where student employees got busted drinking alcohol in April by Mr. Iannello was a planned trip for them to get alcohol". Id. He told Colonna that plaintiff was involved in a similar planned trip that evening [July 31, 2012], but that "the plan got screwed" when Walker insisted that Iannello drive the bus instead of Haynes. Id. Perrin stated that there were "drop spots" in the Center where students knew they could pick-up alcohol and leave money. Id. Perrin told Colonna that this conduct had been going on since he arrived at the Center and that about 60 percent of the student employees knew about it. Id.[7]

On August 2, 2012, plaintiff was counseled by Teresa Van Son, the human resources director ([30-2], p. 51 of 74). Plaintiff acknowledged that this was related to allegations that he

---

[6] Plaintiff identified Colonna as the student human resource manager, "like the principal" ([30-1], p. 91 (48 of 93)).

[7] Plaintiff testified that he did not see the statements by Perrin and Rosado prior to being terminated. He denied the substance of the statements by Perrin and Rosado that he had been involved in selling alcohol to students ([30-1], pp. 91-104 (48-59 of 93)).

had been supplying alcohol to students ([30-1], p. 89 (46 of 93)). In the Confirmation of Conversation Van Son stated:

> "During your time as an employee at the Iroquois Job Corps Center, we have received repeated accusations over the span of several years, which could be perceived as negative. We have investigated these allegations after each report. Other than the statements collected from student employees; we have been unable to fully prove the claims. Once again, we are being put in a position to defend you. . . . Please be advised that the situation puts our student employees and ETR-Iroquois Job Corps Center at risk and we are advising you: if we receive further claims of a similar nature, your position as an at-will employee will be terminated."

([30-2], p. 51 of 74). Plaintiff admitted that he was put on notice that if ETR received further claims of a similar nature that his employment would be terminated ([30-1], p. 89-90 (46-47of 93)).

On August 16, 2012, another student, Nelson Rosado, provided a statement to Colonna that he personally witnessed plaintiff "sell contraband on campus to Omar and Walt". ([30-2], p. 54 of 74).[8] Rosado stated that "Walt" would meet with plaintiff to obtain the contraband, distribute it to other students, and "bring [the] profit to" plaintiff. Id. He stated that he personally saw another student involved in the plan "wave signals of security" to plaintiff. Id. On that same date, Eric Vaughn, plaintiff's direct supervisor, provided plaintiff with a notice terminating his employment at the Center, stating:

> "During your time as an employee at the Iroquois Job Corps Center, we have received repeated accusations over the span of several years, which could be perceived as negative. We have investigated these allegations of policy and conduct violations. Once again, we have received statements indicating that you are involved in covert actions that put our students' safety at risk; this conduct does not meet our standard of promoting the best interest of our students."

([30-2], p. 53 of 74).

---

8 Plaintiff testified that he was familiar with Omar and Walt, and described them as "Ex-Job Corps students" ([30-1], p. 102 (57 of 93).

Plaintiff alleges that he was subjected to a hostile work environment, disparate treatment and retaliation by Walker based upon his race in violation of Title VII, §1981 and the New York Human Rights Law. ETR seeks summary judgment on the grounds that plaintiff cannot establish a *prima facie* case that any actions taken by Walker were motivated by plaintiff's race, that plaintiff cannot establish the existence of a hostile work environment, that plaintiff did not engage in protected activity, and that he was terminated for legitimate, nondiscriminatory reason.

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where there are no issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. ("Rule") 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, (1986); Trans Port, Inc. v. Starter Sportswear, Inc., 964 F.2d 186, 188 (2d Cir. 1992). The court must draw all reasonable inferences in favor of the non-moving party and grant summary judgment only if no reasonable trier of fact could find in favor of the non-moving party. See Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991); Howley v. Town of Stratford, 217 F.3d 141 (2nd Cir. 2000). However, the non-moving party must "demonstrate to the court the existence of a genuine issue of material fact". Lendino v. Trans Union Credit Information Co., 970 F.2d 1110, 1112 (2d Cir. 1992). A fact is material "when its resolution would affect the outcome of the suit under the governing law", and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party". General Electric Company v. New York State Department of Labor, 936 F.2d 1448, 1452 (2d Cir. 1991).

"The non-moving party must come forward with enough evidence to support a jury verdict . . . and the . . . motion will not be defeated merely . . . on the basis of conjecture or surmise." Trans Sport, 964 F.2d at 188.  If undisputed material facts are properly placed before the court by the moving party, "those facts will be deemed admitted, unless they are properly controverted by the non-moving party". Glazer v. Formica Corp., 964 F.2d 149, 154 (2d Cir. 1992). The court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them.  See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir. 1990).  However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2d Cir. 2000).

**B.  Shifting Burden in Discrimination Cases**

Title VII makes it unlawful for an employer, among other things, to "discharge any individual . . . because of such individual's race . . . or national origin." 42 U.S.C. §2000e–2(a)(1). Discrimination cases based on circumstantial evidence brought pursuant to the Title VII are analyzed under the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (1973); United States v. City of New York, 717 F.3d 72, 83–84 (2d Cir.2013) (discussing application of McDonnell Douglas framework to race discrimination claim). Similarly, claims under §1981 and the New York State Human Rights Law are "all are evaluated according to the three-step burden-shifting framework set forth in McDonnell Douglas." Jackson v. City of New York, 29 F.Supp.3d 161, 170 (E.D.N.Y. 2014).

Under this burden-shifting framework, the plaintiff bears the burden of establishing a *prima facie* case of discrimination by showing that: 1) he belonged to a protected class; 2) he

was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). "Once the plaintiff has met this *de minimis* burden, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse action. If the defendant establishes such a reason, the presumption of discrimination created by the *prima facie* case drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination". James v. New York Racing Association, 233 F.3d 149, 154 (2d Cir.2000); *see also* McDonnell Douglas, 411 U.S. at 804; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir.1997). The plaintiff "must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons but were a pretext for discrimination". Reeves v. Sanderson Plumbing Products Inc., 530 U.S. 133, 142-43 (2000).

To establish a hostile work environment claim, a plaintiff must prove that "the workplace [was] permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, (1993). It is well settled that criticism of an employee's work performance does not amount to an adverse employment action. *See* Weeks v. New York State Division of Parole, 273 F.3d 76, 86 (2d Cir.2001) ("[i]t hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action"); Turley v. ISG Lackawanna, Inc., 803 F.Supp.2d 217, 239 (W.D.N.Y.2011) ("[e]xcessive monitoring and oversight of work do not constitute adverse employment action").

Negative performance evaluations or written warnings, without an accompanying change in the terms and conditions of employment, will not rise to the level of an adverse employment action. *See, e.g.*, Chang v. Horizons, 254 F. App'x 838, 839 (2d Cir. 2007) ("oral and written warnings do not amount to materially adverse conduct"); Shaughnessy v. Xerox Corp., 2015 WL 1431687 (W.D.N.Y. 2015) ("[i]t is well established, however, that criticisms, and even written warnings, do not constitute adverse employment action where there is no diminution in pay, job status, or benefits."). Similarly, "trivial harms," "petty slights or minor annoyances" or "personality conflicts . . . that generate antipathy and snubbing" do not rise to the level of an adverse employment action. Tepperwien v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 571 (2d Cir. 2011) (comment made by supervisor at employee meeting not materially adverse action, nor was using a false reason to prompt Plaintiff to attend a meeting).

**C. Inference of Discriminatory Intent**

ETR asserts that the plaintiff cannot establish that he suffered an adverse employment action under circumstances giving rise to an inference of discriminatory intent. ETR's Memorandum of Law [29], p. 10. Plaintiff, who is African-American, claims that he was discriminated against based upon his race by Walker, who is also African-American.

Although the fact that the plaintiff and the alleged discriminatory actor are members of the same protected class does not preclude a discrimination claim, generally "courts draw an inference against discrimination where the person taking the adverse action is in the same protected class as the affected employee." Benedith v. Malverne Union Free School District, 38 F. Supp. 3d 286, 319 (E.D.N.Y. 2014); Eder v. City of New York, 2009 WL 362706, *8 (S.D.N.Y. 2009) (finding no inference of discrimination and awarding the defendant summary

judgment where the plaintiff and her "immediate supervisor who assessed [her] performance and determined that it was lacking are members of the same protected class"); Tucker v. New York City, 2008 WL 4450271, *5 (S.D.N.Y. 2008) ("any inference of race discrimination is further undermined by the fact that all three superintendents under whom [plaintiff] worked as well as three of his four direct supervisors at the DOE were also African–American"); Sykes v. Mt. Sinai Medical Center, 967 F.Supp. 791, 797 (S.D.N.Y.1997) (observing, in granting summary judgment to the defendant, "the person making the decision to terminate plaintiff . . . was [of the same race]").

Even if such an inference did not apply, plaintiff has failed to demonstrate that Walker's conduct was motivated by plaintiff's race. Plaintiff's primary complaint with respect to his hostile environment claim is that Walker repeatedly referred to him as "peanut head", suggested that he worked like "a Jamaican", and called him slow and stupid. Plaintiff's Memorandum of Law [37], p. 5. However, during his deposition plaintiff acknowledged that being called "peanut head" is a reference to his intelligence ([30-1], p. 84 (41 of 93)). Plaintiff related the phrase to being called "stupid". Id. He testified that his children call him "peanut head" and stated that although he was not offended when his children called him that, he found it insulting and disrespectful coming from Walker. Id., pp. 84-85 (41-42 of 93).[9]

Similarly, plaintiff testified that when Walker suggested he worked like a Jamaican, it was a reference to the fact that Jamaicans "work so hard, Jamaican means slave" because "they work so hard and from sun up to sun down, two, three jobs. And I was doing that, this guy here,

[9] In opposition to this motion, plaintiff cites an on-line urban dictionary that suggests that "peanut head" is slang "[t]o describe a gang banger, in a vehicle, who has shaved his head". Plaintiff's Memorandum of Law [37], p. 8. Although plaintiff suggests that this term is "recognized as being racially motivated", he provides no authority for that proposition. In any event, plaintiff's own deposition testimony reflects that he did not interpret the term "peanut head" in that fashion, and the record contains no evidence that Walker use the term in that manner.

he works like a Jamaican". Id., pp.85-86 (42-43 of 93).[10] When asked if it was possible that Walker was complimenting him for working hard, plaintiff stated: "She might have said it like that but I didn't take it like that". Id., p. 86 (43 of 93).

Plaintiff's allegations concerning what he deemed to be disparate treatment also fail to demonstrate that Walker was motivated by racial animus. Plaintiff's claim is based upon allegations that Walker did not allow him to park close to the recreation area and subjected him to security checks which were not required of other ETR employees. In this regard, plaintiff's claim that such actions were racially motivated is undermined by the fact that Walker did not treat other African-American employees in the same manner. During his deposition, plaintiff acknowledged that Shannon Washington and Wade Smith, both of whom are African-American and held the same job title as plaintiff, were allowed to park close to the recreation area. Id., p.118 (69 of 93).  He also acknowledged that no other employees, white or black, were required to be checked through the security procedures. Id., pp. 116-121 (67-72 of 93). Indeed, plaintiff stated that he was singled out by the security department because Walker advised them that he was bringing alcohol and marijuana onto the campus, thus acknowledging Walker's non-discriminatory animus for this conduct. Plaintiff's Declaration [36], ¶¶ 39-40.[11]

At his deposition, plaintiff did not state that Walker's conduct toward him was racially motivated. Instead, when asked why he though Walker picked on him, plaintiff stated that it was "[b]ecause I think I had a better relationship with some of the students" and that Walker was

---

[10]   Plaintiff testified that he is not of Jamaican ethnicity and admitted that by using this term Walker was not referring to plaintiff's ethnicity but instead to the fact that he worked hard. Id., p. 85 (42 of 93); Plaintiff's Memorandum of Law  [37], p.9.

[11]   Regarding the security measures, plaintiff testified that Walker told him that she heard "rumors and suspicions" from students regarding plaintiff providing students with alcohol, and in response plaintiff stated "feel free to check me, Ms. Walker" ([30-1], p. 123 (74 of 93). Plaintiff's testimony in this regard supports defendant's argument that Walker's conduct in requiring plaintiff to submit to security measures was based upon a legitimate concern and not based upon discriminatory animus.

"jealous" because he was a better basketball coach than she was ([30-1], p. 130 (81 of 93).[12] When asked if there was any other reason why Walker singled him out, he responded that it was because he "had a good relationship with all the students, males and females, and she didn't like that". Id., pp. 132-133 (83-84 of 93).

Notwithstanding his deposition testimony, plaintiff argues that Walker's conduct was racially motivated because she purportedly believed that some African-Americans deserved to be demeaned because they did not appear to be intelligent to her. Plaintiff's Memorandum of Law [37], p. 10-11. This argument is not persuasive. Plaintiff has presented no evidence linking Walker's conduct to his race. Calling someone names to infer that they are stupid or lack intelligence, while rude and unprofessional, is insufficient to support an inference of discriminatory animus. *See* Ford v. New York City Department of Health & Mental Hygiene, 545 F.Supp.2d 377, 389 (S.D.N.Y.2008) (finding no inference of gender discrimination where woman was called "fat fish" and "stupid fish", as those comments, while "disrespectful and rude . . . are not objectively indicative of gender animus"); Bickerstaff v. Vassar College ., 196 F.3d 435, 451 (2d Cir.1999) ("Title VII does not insulate an individual from criticism that is not based on an impermissible reason").

While the record may be said to reflect that Walker did not like plaintiff, it is devoid of evidence that her enmity was directed toward plaintiff because of his race. This is not a case where the alleged discriminatory actor suggested that all members of a race, or even a particular subset of a racial classification, are stupid or lacking in intelligence. Plaintiff has presented no evidence whatsoever that Walker's comments were made in reference to anyone other than plaintiff himself. The record reflects that other African-Americans working at ETR with the same title as the plaintiff were not subjected to similar treatment by Walker. Plaintiff can point

[12] Walker coached the basketball team before plaintiff was asked to coach. Id.

to no evidence supporting the proposition that Walker, herself an African-American, acted with racial animus by calling plaintiff names commenting on his intelligence or work ethic, by denying him a convenient parking spot, or by requiring that he submit to security procedures.[13]

Because plaintiff has failed to raise a triable issue as to whether Walker's conduct constituted an adverse employment action under circumstances giving rise to an inference of discriminatory intent, he has failed to establish a *prima facie* case of a violation under Title VII, §1981, or the New York Human Rights Law. Defendant's motion for summary judgment should be granted dismissing plaintiff's Title VII, §1981, and New York Human Rights Law claims.

**D. Retaliation Claims**

Plaintiff claims that after he complained about Walker to Melissa Volpe, the center director, Walker retaliated against him by "concocting" the allegations relating to him selling alcohol to students and orchestrating his termination. Plaintiff's Memorandum of Law [37], pp.18-22.

Claims of retaliation are also analyzed under the McDonnell Douglas burden-shifting rules. *See* Richardson v. New York State Department of Correctional Services.,180 F.3d 426, 443 (2d Cir.1999). "To make out a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) [he] engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the

[13] It is well settled that a supervisor's mere criticism of an employee's work, even when loud or belittling, does not fall within the ambit of Title VII unless his conduct is so severe, pervasive, offensive and "permeated with discriminatory intimidation" as to alter the terms and conditions of his subordinate's employment. Harris, 510 U.S. at 21. *See also* Marshall v. New York City Board of Elections, 322 Fed.Appx. 17, 18-19 (2d Cir.2009) (affirming district court's grant of summary judgment on plaintiff's hostile work environment claim, because although plaintiff's "allegations that her supervisor displayed a violent temper, stood over her with clenched fists on several occasions, disparaged her educational background, and engaged in crass behavior are troubling," Title VII "prohibits only harassment that is discriminatory").

protected activity and that adverse action." Kelly v. Howard I. Shapiro & Associates Consulting Engineers, P.C., 716 F.3d 10, 14 (2d Cir.2013). Once plaintiff makes out a *prima facie* case of retaliation, the burden shifts back to the defendant employer to show that there was a legitimate, non-retaliatory reason for its actions. If the employer meets its burden, the burden returns to the plaintiff to show that "there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Richardson, 180 F.3d at 443.

ETR argues that plaintiff did not engage in protective activity because he never complained to anyone at ETR that Walker was harassing him based upon his race. ETR's Memorandum of Law [29], pp. 23-14. Plaintiff testified that he complained about Walker's conduct to Volpe ([30-1], pp. 136-37 (86-87 of 93)). When asked if he complained about discrimination, plaintiff stated "No". Id., p. 136 (86 of 93). He stated that he complained to to Volpe that Walker was "harassing me for no reason". Id., p. 137 (87 of 93). Plaintiff testified that his conversation was that Walker did not like him because he was a better basketball coach than she was. Id. His meeting with Volpe was approximately six months before he was terminated. Id., p. 138 (88 of 93). Thus, plaintiff's deposition testimony reflects that he did not advise Volpe that he believed he was being discriminated against by Walker based upon his race.

In a declaration in opposition to this motion, plaintiff states that when he was being deposed he "forgot" to state that he had told Volpe that Walker called him "peanut head" and "Jamaican". Plaintiff's Declaration [36], p. 70. Such attempts to offer testimony which contradicts the plaintiff's deposition testimony are generally disregarded. Butler v. Raytel Med. Corp., 150 F. App'x 44, 46 (2d Cir. 2005) (rejection of affidavit offered in opposition to summary judgment were plaintiff had been asked in his deposition whether he had made "any other complaints to anybody" at his employer concerning what plaintiff believed to be race

discrimination and plaintiff answered, "not to my knowledge"); *see also* Palazzo ex rel Delmage v. Corio, 232 F.3d 38, 43 (2d Cir.2000) ("in opposing summary judgment, a party who has testified to a given fact in his deposition cannot create a triable issue merely by submitting an affidavit denying the fact"); Erhunmwunse v. Edison Parking Corp., 301 F. Supp. 2d 278, 283 (S.D.N.Y. 2004) (plaintiff affidavit stating alleged racial remark disregarded where plaintiff testified during his deposition that he could not recall any racially charged comments) (emphasis added).

Here, plaintiff was expressly asked at his deposition if he had made any other complaints to Volpe regarding Walker's conduct, to which he replied: "Not that I can recall" ([30-1], p. 137 (87 of 93). These newly asserted allegations can be disregarded pursuant to Butler, Palazzo and Erhunmwunse.

Even if the allegations in plaintiff's declaration are not disregarded, plaintiff has failed to demonstrate that he engaged in protected activity, because plaintiff's complaint to Volpe would still not have put ETR on notice that plaintiff was complaining of racial discrimination. Although plaintiff contends that he told Volpe that Walker was "out to get him" (Plaintiff's Declaration [36], p. 78), called him "peanut head", and stated that he worked like "a Jamaican", such conduct under these circumstances does not reflect racial animus. Plaintiff, himself, as reflected in his deposition testimony discussed above, construed Walker's name calling as commenting on his intelligence and work habits, not as racial slurs. Such an inference is particularly reasonable in light of the fact that Walker is the same race as plaintiff. Plaintiff's legal theory of discrimination is based upon the argument that Walker harassed him because she was ashamed of people of her own race who she believed were beneath her. Id. However, plaintiff points to no evidence that would have, without more, put ETR on notice of the discriminatory aspect of this

rather uncommon theory. As discussed in Marcus v. Barilla America, New York, Inc., 14 F. Supp. 3d 108, 117 (W.D.N.Y. 2014):

> "While there was no need for plaintiff to use the term [discrimination] in order for [the employer] to surmise that it was the true subject of plaintiff's complaint, plaintiff's complaint contained no other factual clues that might have "ma[de] the employer aware of alleged discriminatory conduct." International Healthcare Exchange Inc. [v. Global Healthcare Exchange LLC], 470 F.Supp.2d at 357. *See* Foster v. Humane Society of Rochester & Monroe County, Inc., 724 F.Supp.2d 382, 394–395 (W.D.N.Y.2010) (in order to allege that complaints to management comprised protected activity, a plaintiff must allege that she complained about acts of discrimination, and not other issues or work-related problems outside the scope of antidiscrimination statutes)."

In any event, assuming plaintiff had sufficiently put ETR on notice that he believed Walker was discriminating against him based upon his race, he has failed to establish a causal connection between his complaint about Walker and his termination. Plaintiff's theory in this regard is that Walker "concocted" the statements by Perrin and Rosado and (in some undisclosed manner) influenced Volpe, Van Son, and Vaughn to terminate him without investigating the claims. Plaintiff's Memorandum of Law [37], p. 18-22. However, as noted above, plaintiff has presented no evidence, other than his own conjecture, to support this claim. Plaintiff testified that he had no knowledge that Walker was involved in the statements by Perrin and Rosado, but that it was "just my feeling" ([30-1], p. 104 (59 of 93)). Plaintiff's testimony that unnamed students had spread rumors that he was going to get fired (id., p. 96 (53 of 93)) is insufficient to raise a triable issue to defeat summary judgment. The documentary evidence reflects that the statements by Perrin and Rosado were made directly to Colonna. Plaintiff has presented no evidence that Walker influenced the substance of those statements. Moreover, plaintiff has presented no evidence whatsoever that Walker was involved in the determination to terminate plaintiff or that

she acted to influence Vaughn, Van Son, or Volpe in any way with respect to the termination decision.[14]

In sum, plaintiff has failed to establish any causal connection between his termination and his complaint to Volpe about Walker's conduct. Therefore, ETR's motion for summary judgment as to plaintiff's retaliation claims should also be granted.

## CONCLUSION

For these reasons, I recommend that ETR's motion for summary judgment [27] be granted. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by April 15, 2016 (applying the time frames set forth in Fed. R. Civ. P. ("Rules") 6(a)(1)(C), 6(d), and 72(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each

---

14 Plaintiff also argues that under the "cat's paw doctrine" Walker's discriminatory animus is imputed to the person who actually terminated plaintiff. Plaintiff's Memorandum of Law [37], pp. 20-21. Because the plaintiff has failed to establish discriminatory animus on the part of Walker, the cat's paw doctrine is inapplicable since there is no discriminatory animus to impute.

objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: March 29, 2016

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge